Okay, next case for argument, United States v. Smith, Mr. Stiller. Good morning and may it please the Court. On the question of whether Dontray Smith was seized, I think it's useful to return to that portion of the record when the officer who encountered and communicated with Mr. Smith recounted those details. The officer said that he asked only, did Smith possess a weapon? And while Smith's words were that, yes, I have a gun, the officer described that Smith dropped his head, nodded towards his right, and said, yes, I have a gun. That's a physical manifestation of a citizen's submission. And it's our position that that submission was in response to law enforcement show of authority in the preceding minutes. If so, that's a seizure under Mendenhall, and under the facts of this case, it's an unreasonable seizure. Mendenhall suggests or states that whether a citizen is seized or merely consensually contacted by the police turns on a totality of the circumstances. And while Mendenhall poses a series of questions to guide courts in addressing such issues, it's important to note that those questions aren't literal individual yes-no questions to be answered with an affirmative or negative check independent of one another. So one of the questions Mendenhall considered is, essentially, was the citizen outnumbered? In Mendenhall itself, two drug enforcement agents encountered a single citizen in a terminal of the Detroit airport. Mendenhall wasn't seized. Here, two officers encountered Mr. Smith not in an airport terminal, which is presumably well lit, not in an airport terminal, which is presumably populated at most hours of the day by multiple other people, official and unofficial. They encountered Dontre Smith two-on-one in an alley at 10 p.m. on a summer night. Mendenhall asks whether there was a display of weapons. And again, that's the language Mendenhall used, but it shouldn't be viewed so literally. Because below, in this case, in the government on appeal, seems to suggest that because the officers didn't brandish their guns or point them at Smith that- Can you ask him whether he had heard gunshots? No, the only comment directed to Mr. Smith was, do you have a weapon? That goes to another Mendenhall factor. Mendenhall spoke in terms of what was the tone and words used by the officers. Did that convey coercion? Again, I don't think we should be so narrow. Indeed, I think it's in this court's case, Boris, if the officers had politely and calmly said, we suspect you of possessing a gun, do you have one? I think Boris stands for the proposition that on that question alone, Mr. Smith was seized. Was he walking when they rode up on their bikes? Yes. He was crossing a street from one part of the alley to the part of the alley on the other street. The officers saw him on the east side of the alley. The officers, two of them on their bicycles, went into the left side of the alley, westbound. Then when Mr. Smith continued his traverse across the street and into the alley heading west, that's when the officers on their bicycles made their U-turn from about 20 to 25 feet away, closed a distance on Mr. Smith, parked their bikes in front of him adjacently at 45 degree angles, about five feet away from him. The one officer got off his bike, didn't say, excuse me, sir, we'd like to talk to you, didn't say, police, could we have a moment of your time? Didn't say, did you hear shots fired? He simply said, nothing more than, do you have a weapon? I submit that that's the functional equivalent of, we suspect you of something, but in the totality of circumstances which Mendenhall speaks to, all of this behavior- Let me ask you, and so this was like this 45 degree angle, and this was about five feet in front of him? That's what the record indicates. I don't know whether the 45 degree angles of the two bikes looked like this or looked like that, but they were staggered at 45 degree angles. I suggest that the reasonable inference from the particular placement of those bicycles was to communicate that Mr. Smith's right of forward movement was not unhindered. He's also in an alley. There's not much, I don't think the record gives any indication of the specifics of the alley, but it is a residential area, so it seems a reasonable inference that if his path of forward movement is impaired by the placement of the two officers and the two bicycles, this being an alley, going left and going right aren't really viable options, such that really the only unimpaired route, if he chose to exercise his supposed right to walk away and terminate the encounter, was to turn on his heels and go in the opposite direction. In a vehicular context, this court, and I think it was Burton, said that when a car is parked and surrounded left, right, and front by police officers, and I think there were bicycle officers in that case, I'm not certain of that, that's a seizure, notwithstanding the fact that the driver of that vehicle could theoretically have thrown it in reverse and gone about his business backwards. Mr. Smith was faced with the same circumstance, only a foot rather than at the wheel of a car. Again, the darkness of the hour, the two-on-one scenario, I started touching on the idea of the officers being armed. Indeed, as the government points out, the guns weren't brandished, displayed, or pointed at Mr. Smith, but I don't think that that's, it's hardly dispositive, and I don't think it's of much moment, because quite frankly, if the guns had been pointed at Mr. Smith, I think under Hodari D., that circumstance in and of itself constitutes a seizure. So when Mendenhall, under the totality of circumstances, speaks to a display of weapons, and that's the word that Mendenhall uses, clearly I submit that that contemplates the passive display of a weapon. And here, both of these bicycle officers were in full uniform with their sidearms, and those sidearms were presumably visible. I think it's interesting that your argument is focusing very much on the details of where the bikes were positioned, and whether firearms were brandished. From your brief, I got the sense that there's a more big picture argument that you'd like to make here, about whether or not there ever really is a consensual encounter between somebody who is in this person's position, Mr. Smith's position, in a high crime neighborhood, as you point out, a person of color in a high crime neighborhood where there's a lot of distrust of police, whether there's ever really a consensual issue. And so, hearing your argument now being very fact-based, I'm wondering whether you'd like us to focus on this very detailed analysis of the totality of the circumstances, or whether you're really arguing for what might be perceived as an expansion or clarification of a bigger legal issue regarding what's consensual and what's not, given a certain environment that somebody lives in. Judge, I guess I'll try to answer your question by saying what I'm not doing, followed by what I am hoping to do. I am not asking this court to change the legal landscape. I am not asking for a bright line per se rule, and I am not asking for an application or creation of a subjective test. What I am suggesting is that under Mendenhall, the totality of circumstances are in play, and that when it's a neighborhood like this, that by the officer's own admission, is saturated by police officers, the residents of that neighborhood, who are on the wrong end, or maybe the right end, who are the recipients of the saturation, Director Comey of the FBI said it very well. The problem with the totality of circumventable cliche is you don't want to leave the impression that if you didn't have all the things you had in this case, you'd have been perfectly fine, right? If I hear your question correctly, Judge, if my client were a white person and this happened in an upper middle class suburb, I would be making the same argument that he was seized. It was the same argument? Yes, on the facts. What I was thinking of is, suppose it wasn't dark, you know, that's part of your totality. Correct. Is that critical? It's an important thread in the broader cloth. It seems to me you have a lot of things going for you, and you don't want to create the impression that anything short of that the police can do, right? Every case necessarily has to be evaluated on its own unique facts. So if we dropped out the time of day or the darkness of the hour, I don't know what the answer would be, but the reality here is that it was a dark night in a lonely alley. Very unrealistic. The night isn't that important, right? You have a couple of policemen parking in front of you and asking you whether you have a gun. What is he supposed to say? None of your business. Right? Well, unless he, under those circumstances, would have felt free to say, none of your business. But of course he wouldn't have, right? Correct, because he was seized. Right. So, I mean, he's going with you on this. He's not hurting you. I mean, you're like, no, they blocked him. He was cornered in the alley. They were five feet away. That's the critical facts. That's all. It's just a question of the totality, of course, is something that we have to take into account. But, I mean, if there was a compelling reason or clear facts that indicated it was a seizure, you agree those are the most critical facts. Correct. I hope that's the right answer. I see my time is up, and I should probably stop talking. Thank you. No, thank you very much, Mr. Stiller. Mr. Wesley? Ms. Wesley, I'm sorry. Good morning. Obviously, I disagree with the characterization that the totality of the circumstances in this case resulted in a seizure of Mr. Smith. In looking at the case law by the Supreme Court, as well as this Court, looking at all the circumstances in this case, Mr. Smith was not, in fact, seized in this case. Well, what was the reasonable suspicion? There was no reasonable suspicion, Your Honor. So you conceded that? Yes, Your Honor. This contact was consensual. Going back briefly, the officers started out, I believe, on North Avenue, Tetonia, in Milwaukee, Wisconsin. They moved to another location and spoke to witnesses very briefly at that location. There weren't any pleasantries exchanged with the witnesses at that particular point. They merely asked, you know, did you hear gunshots? And then received the information that, okay, the gun, we heard them west of here. And the officers moved on to that particular location and eventually encountered Mr. Smith. And when they encountered Mr. Smith, admittedly, there were not any pleasantries exchanged. However, the officers did not treat him— No, no. But what they should have said was, you know, we're investigating. We heard some shots. We're doing an investigation. We'd like to ask you some questions. We're not arresting. You know, we'd like to ask you some questions. That's the way you're supposed to do these things. Otherwise, you say you have a gun. No one's going to leave. Well, I think that— None of your business whether I have a gun. Go get a warrant. You know, people don't react that way. I think time and time again, the courts have addressed these issues, whether or not asking incriminating or accusatory types of questions are seizures, in fact. And for the most part, in fact, overwhelmingly, the courts have ruled that no, asking those types of questions in and of themselves are not seizures. I don't get that. I don't know the case, but I don't get that. Yeah, what about the Burton case? The only difference, they were in the car. The individual was in the car, but the bike blocked the car. And then one from the side, one from the front. The court didn't agree with your analysis there. Well, respectfully, this case did not involve a vehicle. We're talking about a subject who was walking. Which is what— Yeah, so this is even— You're even more vulnerable because you don't even have the car between you and the officer. It's just you walking, and they're on the bikes. I have a number of cases that I'd like to talk about the circumstances in which officers approached individuals. There's Drayton. Three officers get on a bus. One officer is sitting in the driver's seat. One officer is at the back of the bus. Another officer is walking through the aisle and talking to different witnesses. In that case, there was not a seizure. The individuals had an opportunity, still had, to exit the bus. Well, did they just go up to the— Did that police officer just walk down the aisle and say, Do you have a gun? Do you have a gun? Do you have a gun? Or did they say, you know, We're investigating something. We'd like your cooperation. There was an introduction in Drayton, I believe. And so they didn't say, Do you have drugs? Do you have drugs? Do you have drugs? No, they didn't. I believe they identified themselves as drug investigators and asked if they could search their drugs. Isn't that a very important distinction? And isn't it very easy for the police, if they really just are looking for information, not trying to nail a person, simply to explain, you know, why I'm asking you these questions? I don't think there's a problem with that at all. Obviously, that was the preferred route. Those aren't, however, the facts in this case. And I don't believe that the explanation, the introduction is necessary in order for a consensual encounter to occur. I would also direct the court's attention to INS Vito Delgado. In that case, you had a number of DHS investigators entering a factory, and many of the investigators were stationed at the exits. And in some cases, the agent would talk to different individuals who were working in the factory and ask them whether or not they had their paperwork, whether or not they were legal. In that particular instance, how they answered the question determined whether or not they may or may not be arrested. If they did not have their paperwork, if they were not in the United States legally, then they were subject to arrest based on a question by the officers. Did they know who was asking them the questions? I believe they were. I don't know if they introduced themselves as officers. I believe when I read the case, there were some instances in which the investigators did not specifically identify themselves to the officers they were talking to that, I'm an officer, these are the questions I want to ask you. Instead, they merely asked, hey, do you have your paperwork? Your paperwork showing that you're legally here in the United States. I think based on Delgado and furthermore based on Chesternut in that case, Michigan v. Chesternut, four officers, I believe, were in a car. The defendant spotted the officers and immediately began to run. The officers followed him, which was not considered a seizure. They followed him in order to see what he was doing. There were no other coercive actions in that case. The lights were not activated in the vehicle. There were no commands to the defendant who was running away. Was that an unmarked car or a police car? An unmarked car. I would assume that it was. Honestly, I don't know if it was marked or unmarked, Your Honor. And that the car was not maneuvered in such a way that it was aggressive. Based on the totality of the circumstances, even despite the fact that the officers followed this defendant after he ran from them, there was, in fact, no seizure in that case. And I believe that looking at Drayton, Delgado, Chesternut, and furthermore, Bostic, in which officers get on a bus and they randomly targeted the defendant and asked whether or not they could search Bostic's luggage. In Bostic, however, he was advised that he did not have to consent. Right. That's kind of a big thing, to be advised that he didn't have to consent. I mean, as distinguished from our situation. Certainly, but the courts have ruled that, certainly, officers are not required to tell anyone that they have the right to refuse. And that, for the most part, when officers ask questions of citizens, they are cooperative. But that, in and of itself, doesn't mean that what has occurred is a seizure. In this case, there's talk of officers being positioned at a 45-degree angle in an alley. Now, we're not talking about a sidewalk. We have a picture of the scene in the brief, in the appendix on page 2. And obviously, if the officer stopped at a 45-degree angle to the defendant, and we're standing 5 feet away, perhaps his forward movement would be blocked on the sidewalk, but he could still walk around. But let's move those bicycles and those officers into the alley, which is a much wider berth. If they're positioned at an angle, basically in a triangular position towards the defendant, all he has to do is walk around. His forward movement was not blocked in this case. You're not realistic at all. You don't want to go walking around a police officer. Or through them. Think of it realistically. I am thinking of it realistically. No, you're not being realistic. What the court is proposing in this case, then, is that officers can't really approach... They stop in front of you, they ask you if you have a gun, so you walk around them? That's not a very sensible course of action. And determining whether or not a reasonable person in the defendant's position would have believed that he was free to leave. We have to look at it as if the individual is an innocent person. And if I'm on a bus, if I am walking on the sidewalk, most people who have not committed any crime, wouldn't have any problem telling officers, no, I don't have a gun, no, I'm having a drug. If a police officer comes up to you and says, do you have a gun? And you just keep walking? I'd say no. Ah, you'd say no. That's fine. You would answer, in other words. You wouldn't just walk on. You wouldn't just walk on. You wouldn't ignore the police officer. And that's not what Mr. Smith did. That's not what most people do. And the courts have recognized that most individuals who are addressed by officers, they cooperate. Not if they're carrying guns. Well, Mr. Smith does. This happens all of the time. He figured his number was up. They had him. In any case, I believe that based on the totality of the circumstances, and the case law cited in my brief, that there was not a seizure in this case. They were going to let it go. If he tried to walk off, they'd follow him on their bikes. And I think that one of the officers admitted that... They would take his departure as acknowledgement that he had a gun. Perhaps they would have. And that would be a different circumstance. But in this case... I mean, be realistic about it. I think it is realistic, Your Honor. And as the courts have already indicated, most of the time, when individuals are approached by police officers, they're compliant. They've heard the gunshots. Now they think they have the gunman. If he walks away. Perhaps they do, but he didn't walk away. The officer asked the question, and the defendant responded. No, he knew he wasn't going to get away. I think that's an inaccurate... That's not accurate, and we don't know what Mr. Smith believed in it. And that's not the appropriate standard of review in this case. Why on earth would he admit to having a gun if he didn't feel intimidated by their presence? He'd have to be extremely stupid. There was nothing... Why would someone admit to having a gun when asked by a police officer if he's not either intimidated or really stupid? There are no facts to support that the defendant was intimidated in this case. Answer my question. I can't put myself in the defendant's position. Perhaps he wanted to tell the truth. Hey, I'm asking the question. What is his motivation for saying, yes, I have a gun? He wanted to answer the officer's question truthfully. Why do people admit to crimes and confess to crimes? They don't benefit from it. Neither did Mr. Smith in admitting that he had the firearm. Yet it happens all the time. No, it doesn't. It does. People confess all the time. People don't turn themselves in. They'll confess, of course. They'll make a deal with the prosecutors, or they'll feel the jig is up. They'll do better if they confess, because the authorities have all the evidence. But you don't see a parade of criminals going into the police station saying, you know, I'm a criminal. I've never been caught, but I really feel bad about this. But he was asked a question. He didn't volunteer that information. Have you ever encountered someone like that? Bet you haven't. He wasn't walking down the alley saying, look at me, I have a firearm. Please come and arrest me. The officers asked that question and he answered it truthfully. Based on all the facts and circumstance in this case, there was no coercion in this matter. And I would ask the court affirm the district court's decision. Okay, thank you, Ms. Wesley. Stiller, do you have anything further? Only if the court has any questions. If not, no. Okay, well thank you very much. You were appointed, were you not? You're a defense attorney. Okay, well we thank you very much for your services.